Earl, J.
This is an action of libel, in which the plaintiff, a clergyman, recovered against the defendant, his bishop, a verdict of $10,000. From 1878 to the commencement of this action the defendant was missionary bishop of the Protestant Episcopal Church for Niobrara, a jurisdiction over a district of country chiefly settled by Indians, located in the state of Nebraska and the territory of Dakota, and the plaintiff, during a portion of the same time, was a missionary presbyter in the same jurisdiction, and as such was under the charge of the bishop, and subject to removal by him. On the twenty-fifth *506 day of March 1878, the defendant addressed to the plaintiff a letter signed by him as bishop, of which the following is a copy:
“ My Deae Beothee : I address you by this title, and acknowledge the obligation which its use involves, even while I perform the painful duty of writing to say that your persistent disregard of your pecuniary obligations, and your evil report in this neighborhood, render your continuance in the Niobrara mission hurtful to it. I have therefore not appointed you a missionary for this year, and have so notified the Indian committee, and your connection with the mission will end this day. Tour stipend for this month has been deposited with Messrs. Weare & Allison. I am authorized by the committee to continue your salary for a short time, if equity should demand such a course. With the severance of your connection with the mission ceases, of course, your right to the use of any of the buildings, the title of which vests in the Indian committee. I take this action only from a sense of duty, and with the most painful reluctance.”
On tbe eleventh day of April thereafter the plaintiff demanded of the defendant letters dimissory to the diocese of Nebraska, and, in case of refusal of such letters, an immediate trial before an ecclesiastical tribunal organized under the canons of the church. The defendant immediately organized a court, and' that was, after entering upon the trial, dissolved, and then another was constituted, which also entered upon the trial, and finally adjourned sine die, without reaching any conclusion. These courts were attended with some difficulties, embarrassments, and objections, which rendered them abortive.
The failure of these trials was charged by the plaintiff to the conduct of the defendant, and by the defendant to the conduct of the plaintiff. After their failure on the seventeenth day of February, 1879, the plaintiff composed and addressed a letter to the general secretary of the board of managers of the Domestic & Foreign Missionary Society, which was afterwards printed in pamphlet form, and a copy thereof was sent to all the members of the missionary society, which included all the bishops of the Episcopal Church and. others. That pamphlet covers about 30 pages of the printed record, and in it the plaintiff set forth in great detail his relations with the defendant, and made a most vehement, eloquent, and forcible statement of the wrongs which he claimed to have suffered from the defendant. He accused the defendant of taking every occasion to-insult and humble him, and to abuse and browbeat every Indian who dared to lift up his voice in his favor, of treating with kindness every one who was found willing to turn against him, and of openly rejoicing at any information or suspicion that he could turn to his discredit. He characterized his conduct as unlawful, insincere, unfair, unjust, uncanonical, cowardly, unmanly, dishonest, outrageous, remarkable, shameful, passionate, subtle, unscriptural, indefensible, monstrous, unrighteous, highhanded, atrocious, heartless, and cruel.
On the twenty-second day of July, 1879, the defendant composed and caused to be printed, also in the form of a pamphlet, a reply to the plaintiff’s pamphlet, which contained the matter charged in the complaint to be libelous. It was marked “Pri *507 vate,” and sent to the bishops and other members of the missionary society, and to a few other persons especially interested in the missionary worlr among the Indians. In it he charged the plaintiff with misconduct in reference to his pecuniary obligations and other financial matters, and with various acts of gross impurity and adultery. Subsequently, in February, 1880, finding the defendant in the city of New York, the plaintiff began this action by service of process there. In his complaint he does not complain of any of the charges made against him in reference to his financial transactions and pecuniary obligations, but bases his action solely upon the charges of impurity and adultery. In his answer the defendant admits that he composed the pamphlet containing the alleged libel, and alleges "that his action in reference to the matters stated was official and based upon the evil reputation of the plaintiff; that it was written in reply to the previous pamphlet composed and circulated by the plaintiff, and to protect his personal and official character from the attacks of the plaintiff, and not otherwise; that his action in the matter was made necessary by his sense of duty to the church of which he was a bishop, and to the missionary board under whose authority he was acting, and was without malice, and, therefore, privileged; that he would prove, in mitigation of damages, the existence of the rumors and reports stated in the extracts from the pamphlet vvhich were set out in the complaint, and that there was reasonable and probable ground for his believing the information, rumors and reports therein referred to, and for expressing the conviction of the truth of them therein expressed.
Upon the trial the judge held that the pamphlet complained of was so far privileged that the plaintiff, to maintain his action, was bound to show that the defendant was guilty of bad faith, and actual malice hi the publication thereof, and whether he was or not, was the only substantial issue of fact to be tried.
The trial took place more than a thousand miles distant from the country where all the matters to be investigated occurred, and where the evidence relating to them was to be found, in a community where the value of the Indian, and other evidence, and the significance of the facts could not be as well appreciated as they could have been by a jury of the vicinage. The nature of the case was such that the prejudices, passions and sympathies of the jurors could easily be aroused and their judgment warped, and, hence, the rules of evidence should have been strictly observed and enforced ; and it is quite difficult, if not impossible, to say what influence prejudicial to the defendant, any illegal, incompetent or immaterial evidence may have had. A careful study of the whole case led us to the conclusion that the defendant was or may have been prejudiced by the reception, against his objection, of evidence which we believe to have been ineom *508 petent, and by the exclusion of evidence offered by him which should have been received.
1. Upon the trial the defendant put in evidence the plaintiff’s pamphlet of February 17, 1879, for the purpose of showing the provocation and occasion of the publication made by him, alleged to be libelous, and the trial judge held that it was competent for that purpose, but not as evidence of the facts therein stated. Subsequently while the plaintiff was giving evidence as a witness on his own behalf, being shown the pamphlet, he was asked: “ Are the facts stated in that paper — those that are stated upon your personal knowledge — true ? ” The defendant’s objection to this question was overruled, and he answered, “they are.” In this ruling we think there was error. As no ground of objection was specified, the defendant is not now in a position to claim that the plaintiff was permitted to verify in bulk the multitudinous facts contained in the pamphlet. Nearly all the facts alleged therein were stated positively, and it must have been utterly impossible for the jury to discriminate between facts stated upon personal knowledge, and those which werg stated as mere matters of opinion and belief, and upon this ground, too, the question was objectionable, but probably this ground also ought to have been specified. But the pamphlet contained some allegations of fact which were incompetent, some which were wholly immaterial and irrelevant to the issue, and some which, from their nature, the plaintiff would have been incompetent to prove, if he had been particularly questioned in reference thereto. A few specimens will be given : “ The facts are that the Indians who are my friends were all attending church regularly, and "the idea of throwing away their religion had never entered their heads, but because they were indignant and sorrowful at the ■course pursued by their bishop, they would only for special reasons go to the Central Church at the agency when the new missionary was installed.” Speaking of a letter addressed to the Christians of the Santee people by Bishop Clarkson, alleged to have been written at the request of the defendant, the pamphlet states: “So this letter had no effect upon the Indians, except to make them wonder how so good a man could have been led to do blindly, so unjust an act. This bishop has since told me he was sorry for it, and that he wrote the letter with great reluctance and hesitation, and acknowledged that it was an unfair interference with a presbyter who had asked for a hearing, and only asks what it appears is by no means to be granted to him.” Speaking of the person who was appointed prosecutor upon one of the attempted trials of the plaintiff, it characterizes him thus : “ He is a discharged soldier of bad record, an adventurer who has for a long time led a dissolute life and is habitually profane, and he has in no manner mended his ways since being employed by the bishop, who still retains *509 him though his frequent dissipations have been reported, and who admits him at all times to the mission house which I am already adjudged unworthy to enter.” Speaking of one of the attempted trials it states: “ The case was by him withdrawn in a cowardly and unmanly way, for the only reason that it had become evident from the worthlessness of his testimony that the-defendant must be acquitted.” It also stated .as follows : “ He said to the Indian catechist that it would be very bad for him if I was acquitted.” “He (the defendant) said he had only resorted to this subterfuge to gam a few months’ time until the fall of the year, that the whole country might be ransacked if haply they might discover testimony that would convict me. As a member of the court forcibly expressed it, the bishop let go to try and get a better hold.” It is also stated that, at a convention of the clergy called by the bishop within his jurisdiction, the case between the defendant and the plaintiff was. skillfully laid before them in detail, for the purpose of procuring-an opinion favorable to his action already taken, and that the-convocation was procured to adopt a resolution reciting that, under the circumstances, a presentment against the plaintiff was justifiable ; that, at the same time, a resolution of love and sympathy for the plaintiff was adopted, and that the defendant severed the former resolution from the latter, and caused it to be printed and sent to the secretary of the Indian commission for general distribution, and then it is stated: “ When this became known, the clergy were indignant, and three of them, to my knowledge, protested against it as an outrage; ” and then, the pamphlet contains abstracts from the letters severally written by the three clergymen. And then it is further stated: “ I have given only a small part of the abundant testimony at hand as evidence of the irregularity, passion, and subtlety which has characterized all these extraordinary and indefensible proceedings.”
We have now gone far enough to show that there was much matter in plaintiff’s pamphlet which was wholly incompetent and irrevelant upon the trial of this action. So far as the facts contained in the pamphlet of which the plaintiff had personal knowledge, and in reference to which he was competent to testify, bore upon the issue of malice and bad faith, they were competent evidence; and, if the inquiry had been exclusively confined to them, the defendant would have had no reason now to complain. But the question and the answer covered both facts that were competent and material, and those that were incompetent and immaterial, and hence both were'improper. A question must be wholly competent and material, or it must be excluded. When a party assumes to prove in bulk such a large group of facts, he must be sure that they are all competent and it is no answer to an objection made to such a question. *510 that some of the facts were competent. It was not the duty of the defendant, particularly in the absence of any request by the court or the opposing counsel, to grope through the great mass of facts, and point out such as were particularly objectionable. As the evidence as a whole was in its very nature essentially objectionable, a general objection was sufficient.
2. At the first meeting of the ecclesiastical court, organized for the trial of plaintiff, he had objected to the appearance of the defendant against him as a prosecutor, and his objection was sustained by the court. The defendant then designated one Fox, an attorney residing within Ms jurisdiction, as prosecutor, and he appeared before the court in that capacity. He was the same person charged in plaintiff’s pamphlet as being a disreputable character. He claimed to be a communicant of the church, and in the absence of proof to the contrary it must be assumed that he was, and that he was thus canonically qualified to act as prosecutor.
WMle the plainliff upon the trial was giving evidence as a witness on his own behalf, and after he had testified to the appearance of Fox as prosecutor, he was asked by his own counsel this question: “ Do you know whether this man Fox was an associate of Bishop Hare at his house ? ” This was objected to on behalf of the defendant, and the objection was overruled, and the plaintiff answered: “ He was; I know upon one occasion of his going there in a state of gross intoxication, and of Bishop Hare keeping him over night and then being in his company the next day. After that the bishop continued him as the prosecutor in the proceeding that he instituted against me.” This evidence was wholly immaterial, and its sole effect was to disparage and defame the defendant and prejudice him in the minds of the jury.
3. Upon the trial the plaintiff read from a deposition of Bishop Whipple taken de bene esse, and the defendant’s counsel read from the same deposition by way of cross examination, evidence in which he spoke of meeting the defendant in Boston, and he gave as a reason for remembering that the defendant began the conversation there had about the plaintiff, that he was so much shocked about “ this loan of $500.” He did not state what loan was referred to nor what the defendant said upon the subject. He was not inquired of nor examined as to the loan, but what he said about it came not incidentally as a reason for Ms impression or remembrance of another fact. Nothing had been said about this loan in either of the pamphlets, axid there was no allegation about it in the pleadings. Subsequently, while the plaintiff was being examined as a witness on Ms own behalf, his counsel asked Mm this question : “ He stated something to Bishop Whipple about a $500 note, wlfich shocked the bishop very much. Will you state whether that note at the time of this conversation Avith Mm was *511 paid ? ” This was objected to on behalf of the defendant as not being contained in the pamphlet, but as being drawn out by the examination of Bishop Whipple. The objection Avas overruled and the Avitness answered: “ I paid that note and Bishop Hare had the money in his possession at the time with 10 per cent interest on it.”
This evidence Avas incompetent, not Avithin the issue, and probably harmful to the defendant and should not have been received.
4. In the year 1877, a female teacher in one of the schools under the defendant’s charge stated to him that an Indian girl, Cecelia Benoist, a pupil teacher in the school, had made known to her the fact that the plaintiff had brought to her a pair of pantaloons to be mended, and as she Avas looking at them said to her : “ Cecie, I love you very much; Avon’t you Avalk Avith me to night ? I want to talk Avith you,” and that Cecelia’s modesty avus very much offended by his manner; and upon this information the defendant in part relied in making the charge in his pamphlet that the plaintiff had tampered Avith school girls. Upon the trial plaintiff’s counsel asked one of the Avitnesses, a clergyman, Avho resided within the defendant’s jurisdiction, and Avho had testified that he knew Cecelia Benoist there, this question: “Do you know Avhat was her reputation for truth and veracity in that community ? ” The defendant’s objection to the question Avas overruled, and the Avitness ansAvered that it was “ not good; that it Avas bad.” It does not appear that the defendant lcneAvthat her reputation was bad, audit cannot be assumed that he kneAv it. She appears to have been a subordinate teacher in the school and- her story is so far relied upon by the principal of the school that she related it to the defendant. He should not have been deprived of the benefit of the information thus received upon which he in part relied and acted by such a general impeachment of the character of the person, not a witness, from Avhom the information emanated.
5. Upon the trial of this action the defendant’s counsel read from the deposition of Bishop Whipple, in Avhich he testified that the plaintiff came under his jurisdiction as a missionary among the Indians prior to 18G5, and that in that year he had rumors prejudicial to his character for chastity; that he appointed a commission to investigate the rumors, and that the commission made the investigation, and made a report exculpating the plaintiff. He was not asked on behalf of the defendant for his opinion as to the guilt or innocence of the plaintiff, and expressed no opinion on that subject, and he testified to no facts showing or tending to shoAV that he had any ill mil toAvard the plaintiff, or that he had any belief in or connection AAith the alleged libelous charges made by the defendant against the plaintiff. The plaintiff read from the cross-examination of the *512 bishop, in which he was asked this question: “ From the examination that you yourself made of the evidence in regard to-those charges, in 1865, did you form any conclusion in your own mind as to the innocence or guilt of Mr. Hinman?” The objection on behalf of the defendant was overruled, and the witness, answered, “That he was innocent absolutely.” There was nothing in the previous examination of the bishop on behalf of the defendant that made his evidence competent. The defendant had no part in the examination of the plaintiff’s conduct, instituted in 1865, and was in no way concluded thereby. Rumors affecting the plaintiff’s character for purity again became rife in the Indian country within the defendant’s jurisdiction, in the fall of 1873, and the defendant conceiving it to be his duty to investigate them, associated with himself the bishops of Minnesota and Nebraska, and such an investigation as could be made resulted in the plaintiff’s exculpation. Some years thereafter similar rumors again became rife in the Indian country, which led up to the charges made by the defendant upon which this action is based. The continuance of these rumors affecting the plaintiff’s character during so many years, may have led the defendant in gpod faith to doubt the accuracy of the conclusions reached in the former investigations, and in 1879, when he wrote his pamphlet, he had the right, in weighing the facts and the information which came to him, to take into account the plaintiff’s whole life among the Indians, and his standing and reputation in the Indian country. From all. the information he had in 1879 he was not bound to belief that the rumors affecting the plaintiff’s character in 1865, and in 1873, were unfounded. It was, therefore, prejudicial to him to throw into the scale against him the absolute opinion of a most distinguished prelate that the plaintiff was innocent in 1865. It was not one of the issues that was. to be tried whether the plaintiff was actually guilty or innocent at any of the times mentioned. But the sole issue was whether the defendant had knowledge of such fact, and had received, such information that he could, in good faith, and without actual malice, print the pamphlet in which it was charged that the plaintiff’s reputation was infamous in the Indian country, and that he was impure and unchaste with Indian women, and upon, that issue the opinion of Bishop Whipple was not competent, and was well calculated to prejudice the the case of the defendant.
6.- We are also of opinion that some evidence, to which the defendant was entitled upon the trial, was improperly excluded. In the plaintiff’s pamphlet he stated that when Miss West, a. female friend of his, elected to leave the mission and take up her lot with him, the defendant told her he was “ sorry she had any connection with such a beast.” The defendant, while giving his evidence on his own behalf, was asked this question *513 “Now I want to ask you whether anything, and if so what had occurred immediately prior to meeting Miss West, which led you to use the expression which before recess you said you used, in plaintiff’s pamphlet, ‘sorry that she had any connection with such a beast,’ or, as you stated, “ sorry that she had cast in her lot with such a beast ?’ ” and he answered : “ I had just heard of a shocking act of Mr. Hinman in connection with one of the girls of my school.” Upon motion of plaintiff’s counsel this answer was stricken out. We think the defendant was entitled to the answer. - It appeared that the defendant had made this disparaging remark of the plaintiff, and he was entitled to show the circumstances which provoked it and under which it was made, and that the remark was not made maliciously, but while burning with indignation, and shocked by what he had just heard in reference to the conduct of the plaintiff.
The defendant’s pamphlet contained charges against the plaintiff affecting his conduct in pecuniary matters, although in the plaintiff’s complaint no mention was made of that portion ' of the pamphlet, yet upon the trial, upon the question of defendant’s malice, the plaintiff was permitted, against the objection of the defendant, to give explanatory or exculpatory evidence in reference to those matters, denying them. But when the defendant was giving evidence on his own behalf, the judge refused, upon the offer of his counsel, to allow him to state what evidence he had before him for making those statements, and in this there was error. It appearing that the defendant had made these statements, and the plaintiff having testified that they were false, it was competent, upon the issue of good faith and malice, to show upon what evidence his statements were based.
There were upon the trial other rulings of the judge in the admission and rejection of evidence which were dangerously near to error, if not actually erroneous ; but the errors we have particularly pointed out constrain us to believe that the ends of justice require that this judgment should be reversed.
The difficulties and embarrassments attending the trial of this action in the city of New York are such, and consequences of any conclusion so serious to one or the other party, that we may, with propriety, venture to say that the welfare of the missions among the Indians, and that the cause of religion, to which both parties are especially dedicated, would be best promoted if this case, in the spirit of forbearance and charity divinely taught, could be taken out of court, and left to the wise and judicious arbitrament of mutual friends.
The judgment should be reversed, and a new trial granted.
Huger, C. J., concurs; Rapadlo and ANDREWS, JJ., concur in result.